which is Kelham v. CSX. Mr. Garmisa? Your Honor, may it please the Court, Stephen Garmisa here for Chance Kelham. This is a case about an unusual accident with unusual expert testimony. A CSX train ran a red light and rear-ended a stationary brakes locomotive. There was no issue that CSX was negligent for running the red light. The issues at trial were causation and damages. Mr. Kelham testified that at the moment of impact, he was in the lead locomotive of the train that was rear-ended. It was a train that I believe was filled with empty tanker cars. It was around 4,700 feet long. They were all empty? Yes. Fortunately. Empty ethanol cars, yes. There was a fire, but it could have been a lot worse. He testified that he was going down to the lower level. It turns out that locomotives have two levels, the upper level, the cab, which is supported by springs, and then it leads, there's three steps down to a lower level where there's a toilet and a steel bulkhead door that goes into the nose of the locomotive. He testified that he had one foot forward stepping down at the moment of impact, and there was a lurch forward, a sudden stop. He testified that his bottom half went up and his top half went down and sent him into the steel bulkhead door. But if there's a lurch forward, doesn't that push you back, right? That would be part of it. That's the half-truth of Dr. Soumanos' testimony. There would have been, as he was stepping back, Dr. Soumanos said he would have taken a corrective step backwards. So he would have had one step forward, taking the corrective step back, but then the springs that they completely ignore, the springs would have gone backwards also, and then would have snapped forward, flinging him down the stairs because he testified he was looking at his bum, leaning forward. So he would have been flung forward into a rotational force. Their own mechanical engineer testified that this force was sufficient, that his locomotive was fully braked. Wait, I don't understand you. If you're moving forward at some rapid rate and suddenly you're stopped, I mean, say you're driving, you're a passenger in a car and it's speeding along and suddenly it stops. Then you get pushed forward, right? But the complement to that is that if you're sitting in the back of the cab or something and it suddenly drives forward, you're pushed back in your seat. So this is a case where there's this sudden lurch forward and that should have pushed him back. Yes, and as Mr. Knipp, who was the conductor, who was seated in the locomotive, said it whipped him back and forth. He bounced back and forth. There was a desk in front of him and he said it whipped him back and forth because, remember, there are big heavy steel springs in the bottom of the cab and it whips him back and forth. Okay, say that again. Are you talking about springs? Yes. S-P-R-I-N-G. Big steel springs. Okay, so what you were at least referring to, because I was kind of confused about this residual or whatever, you're saying it's not like a normal railroad car. I take the train over here every time I come to Chicago. You know, when a train stops, you think it stops, and then there's some reason it kicks back. I don't know why, but I pay attention to that. I know you race for it. What you're saying is there's something under the engine that is a completely different force than the forward-backward movement, I guess. I don't understand these springs and how they do, but I guess it's like anything else. A car has certain suspension and things like that that don't make it a really hard bounce. You're saying there's some kind of a bounce in the engine. I think we're talking about the same thing. It's the springs. When a locomotive and the rail cars come by us in the station, we can see the big steel springs underneath the car. And what Michael Allencrease, who was a Federal Railroad Administration inspector, testified, he was a CSX supervisor on the date of the accident. He testifies that even during normal operations, when they're coupling cars together in the freight yard and they roll a car at slow speed into a brake locomotive and then they automatically couple when they collide, that causes a shudder. A shudder. And so what I'm saying is it makes sense that there was a shudder back and forth. As Mr. Nip said, it whipped them back and forth between the desk and the back of the seat. Are you saying the locomotive lurched forward and then lurched back? No. What do the springs have to do with it? The springs, because they sway. They sway. It causes the shudder. And that's what flipped. It went back and then it went forward.  What? Does that move the locomotive back and forth? The cab, absolutely. That's what Mr. Allen Priest testified. That's what Mr. Nip testified. That's what you can see from the forward-facing video. You can see a shudder. You can see a little bounce and a little shudder as it jolts forward. Does every car do that? Yes. Well, there's 70-car train. That's what is confusing me. And this is, you know, this train is rear-ended at 45 miles an hour. Right. I guess the driver was asleep. I'm not exactly sure, but it doesn't matter. And so it crunches, it disables a series of cars that go off the rail. And then I assume, if it's the right way to look at it, it's kind of like a domino effect, except it isn't because they're all of equal, whatever you want to call it, force when it goes down. But it would seem as it moves up to the front of the train, each, whatever you want to call it, collision or something as it moves up is diminished. It's dissipated, yes. Okay, and then dissipated. Okay, and then when it finally gets to the engine, that's when they're saying, well, there's a certain amount of force that they're hitting. And you're saying, the reason I ask is, if every car has this bounce, so it's going along, the whole train's jiggling as the thing goes forward. Is that what you're saying? And somehow or other, because he keeps talking about the vertical. Right. And it's not the horizontal. He says he was flipped off of there by the vertical. It wasn't just horizontal because it was, if you look at page A-5, the photo from the National Transportation Safety Board, the cars were going in all different kind of directions. They want to make it seem as though it was like a mother pushing a baby in a stroller. No, we look at that. It was chaotic. That picture's nasty. What? There's no question about it. Yeah, it's scary. But my position is this. They didn't analyze any of those forces. They had a mechanical engineer who was asked, you didn't analyze. He testified, based on his eyeball guesstimates, that it moved forward seven inches in 300 milliseconds. What does he say in cross-examination, for example? He was asked, and he was cross-examined, you didn't say anything in your report about the force of the springs and what the springs did. And he said, you're correct, I didn't. And the follow-up was, why didn't you? And he said, I didn't have to. I had the video from the forward-facing camera. So their position was, ignore the force that bounced them back and forth, that whipped Mr. Nip back and forth, that causes a shutter. Just ignore it. That's not a scientific methodology. Because Dr. Soumanos, their expert, his methodology was figure out what happened, figure out what it would do to people in that vehicle, and then figure out what biomechanically. Reconstruct it, figure out the kinematics, what happens to somebody in the vehicle. So the railroad argues that Kellum's account was contradicted by the medical records which show that he had no bruises or visible injuries following the derailment. Is that correct? That's why it's a... Is that correct? That is correct. And that's why this is a case... ...of what happened? He's bouncing around and he's thrown down the stairs? Because he was... He hit his back flat. It didn't cause a bruise. He was heavily... He was dressed for winter. He was heavily padded. But he said his medical doctors testified that it activated a previously asymptomatic condition, spondylolisthesis, where one vertebra was jutting out in front of the other. And there was no testimony from any doctor who treated him for spinal condition. This was a fellow who had basically a glass spine. You're saying the accident altered his spine? Yes. Why would that create pain? Because he had a condition called spondylolisthesis, where one vertebrae juts forward out of the other. And it's a condition that is graded in four levels. And when the vertebrae... He had grade one, which meant 25% displacement of vertebrae. One of the vertebrae was jut forward towards the nerve. But nobody... And then after the accident, his doctors testified, his treating... The neurosurgeon who performed surgery concluded that that accident caused the previously asymptomatic spondylolisthesis to become symptomatic, and therefore he needed surgery. Is that, in short terms, pre-existing injury was made worse? This is a situation where a pre-existing condition was not symptomatic. So this was like a guy... Oh, I'm sorry. I called it an injury. Pre-existing condition. I don't know how he got it. Well, it might have been congenital. So what did the accident do to this vertebra? It caused the previously asymptomatic condition. Look, that's not what I'm asking. I'm sorry. What did it do to the vertebra? There's a vertebra that's out of line or something. Now, what did the accident do to that vertebra? I don't... Did it push it left, right, forward, backward, or what? Actually, I don't think any of the doctors testified what it did. They just said it made that condition symptomatic. What does it mean to make a condition symptomatic? It must have altered... Didn't it alter the location of the vertebra? I would think so, but they didn't say what activated it. Really? Where's your... Look, I don't get it. You say it was asymptomatic. He's got a vertebra out of line, and it's asymptomatic. Now he's in the accident. What does the accident do to that vertebra? All I can say is that the doctors testified after looking at the MRIs that this was what was causing his post-accident pain. I don't recall testimony that it jutted forward 6 more centimeters or anything that specific. Well, why wasn't the pain immediate? How long did it take for the pain to emerge? It took a day, and 2 or 3 doctors testified that's not unusual. What's not unusual? For a spinal injury to not become painful until a day or 2 after an accident. The 2 or 3 doctors testified to that. Before the accident, he was taking some pretty heavy pain medicine. Yes. So he had this pre-existing thing, and it seemed to be, I don't want to say it was incurable, but it was constant, based on at least what the doctors were saying. This is something that when you're talking about pain and various names of pain medicine and stuff, it was pretty heavy, wasn't it? He had pain from time to time, and he had Vicodin. I think he stopped the prescription for morphine a year before the accident, and he testified that he never lost a day of work. What he did have was a herniated disc in 2009 that was treated with epidural injections in 2009, 2010, and then went back to work and didn't miss a day of work because of back pain until the day of the accident. No, you said there was no pain on the day of the accident. That's correct. Well, you just said the opposite. He was treated for this herniated disc in 2009, 2010, from time to time after he was treated for the herniated disc. I didn't express myself adequately. From time to time from 2010 when he went back to work after treatment for a herniated disc, he did take Vicodin for a period of time. He did take morphine, and I believe he stopped that a year before, and he didn't miss any work. But none of the doctors testified that the post-accident symptoms were related to the spondylolisthesis. The most that the railroad was able to get was testimony that there's a possibility that the spondylolisthesis was causing his pre-accident symptoms. Nobody testified that it was. Wouldn't this have been an ideal case for the judge to appoint his own expert? Absolutely. I wish the judge had a biomechanical expert who would have said, wait, you're not analyzing the springs. You're not analyzing whether or not. Their expert testified it was not physically possible on this planet for him to have been knocked down the stairs. Wait, their mechanical engineer said the force of the collision could move a locomotive forward seven inches, a fully-braked 212-ton locomotive, but it couldn't knock somebody downstairs with the springs? Yes, they should have had an independent expert who would have demolished their mechanical engineer and their biomechanical expert, and I see that I'm in rebuttal time, and I will shut up and sit down. Okay, thank you, Mr. Barbarino. Mr. Tager? Thank you, Your Honor. I don't want to belabor things that we've already said in our brief, so what I'd like to do, aside from answering any questions, of course, is just point out a few things that occurred to me as I was sort of preparing for the arguments that aren't in our brief. And one of the overarching things, which I wish we had done differently, is the briefs are not at all clear as to where these arguments are adequately preserved. And I know that when you have to write your opinion, you'll go back, and that'll probably be the first thing you do, is where are these points raised and preserved? And with the point we were just discussing, the opinion about whether he could have fallen forward, that's been a moving target since the beginning. I think if you look at their motion in limine, which is really the only thing they're entitled to be complaining about here, the only thing they criticized Dr. Tsoumanos for was not taking into account the fact that he was leaning forward and his foot was in the air. There was none of this stuff about whether or not it was bouncing, which, by the way, is the principal theme of their opening brief, is that it's bouncing, vertical motion. There was nothing about that. Now we hear, no, no, it's not the vertical motion, it's a back-and-forth motion. So they've been basically shifting their theory every time someone calls them on the other theory. So I think you already have a pretty good sense of the propriety of the testimony to begin with, but I just figure since you have to actually write the opinion that you would want to take a look at whether the points they're raising today have actually been preserved. Well, if he's... If the locomotive lurches forward, he's pushed back, but suppose then the locomotive stops, then he would be pushed forward. Well, again, this is nothing they raised below or asked him about in his deposition, but I think if you look at the video, and I think from my high school physics, it would be sort of a gradual slow to a stop. I get the point, there are springs, but this is sort of completely new. He wasn't really presented with that theory to analyze, and it doesn't look... Certainly from the video, which is what he did analyze, there's no snapping back. You know, this was... On the video, you can barely see it move forward, much less snap back. The jury saw the video, I take it? Yeah. And they listened to the testimony of all the experts direct and cross? That's correct, Your Honor. And they listened to the plaintiff tell his story? They listened to the plaintiff's story, yes. I think that was why they... And they rejected it? They rejected it, and they listened to his conductor, and I think they didn't believe him either. What was the video of specifically? Was this some kind of a reenactment of some kind? What's the video? The video that the jury saw, and that we're talking about for purposes of this first argument, is the actual locomotive on which the plaintiff and his conductor were working had a forward-facing camera. Okay, so the video is in the train itself? It's on the train, yeah. So it's sort of like an ongoing... I don't know what the video shows, but it's just continuous? It's continuous. What it shows is in front of the train. What the engineer sees it's showing, I guess. Exactly, and all you see is miles of track ahead, and then some... But the video, first of all, the train's still with its brake on. Yeah, the brakes are set. It's been there for about five minutes or something, waiting for another train to go by, and then this one comes along and hits it. So the train is stationary and locked in place with a brake. That's correct. Okay, so the video, I guess it's still, and all of a sudden it does something. So what did the video show? You just see the engine sort of... You see the foreground come closer by a minuscule amount. There's a... What comes closer? The foreground, what's in front of the train, comes closer to the viewer. You mean the train is slowing down? Well, it's just moving forward. It's moving forward. Well, you're talking about after the impact. After the impact. Before that, it's just like Andy Warhol. Seven to nine inches? Pardon? Seven to nine inches? Was that the number of somebody's number? That's what Vosburgh concluded after doing the exemplar and comparing them. So that's certainly our position. It was seven to nine inches. If the court's interested, what he did was he looked at the surroundings, the background from the original video, and he was able to locate the exemplar train and video in exactly the same starting point. And then he says to himself, where is a marker in this first video, the original, that shows me where the train moved to? And he identified there was a diagonal, like, phone pole or something. And that is actually where the train sort of just goes beyond the pole during that one moment of movement. So then what he has to do with the exemplar is says, okay, let's move the train and videotape that until we get to the point where we have brought it even with where it was in the original. And then he went out and measured on the tracks how far did it move. So first they did it, I think it was three inches, because it's a big locomotive. You can't do a perfect amount. You have to sort of do it in increments. Well, did they go to the actual place of the accident? Yes. And put it in the same place? They put it in. Okay. And that's how he measured it. So it went ahead a few inches and then it stopped. And then it stops. And then it stops suddenly? I think if you look at the video, it just looks like it's sort of, it's such a small movement to begin with. It looks like it just sort of hosts to a stop, as you would expect something with, you know, a heavy object with friction to eventually slow to a stop after it didn't push from behind by a force. How did you duplicate the force if they did? You don't need to. All he was trying to do was measure the distance. Then he could use standard equations to calculate the force, because you're starting, he knew how much time it moved that distance. So he was able, I don't have the exact formula in my head. Well, did it stop suddenly? Or did it grind to a stop? Well, from the video, to me, it looks like it just sort of slowed to a stop. It doesn't look like it was sort of abrupt, but, you know, that's just me watching the video and probably the jury saw it the same way. Because if it stopped suddenly, then the momentum would push him forward, right? It's possible, yeah. But that really wasn't... First of all, to repeat one thing we did say in the brief, I think all of this would be a subject for cross-examination. It's not a reason for saying he's so unreliable that he shouldn't be allowed to testify at all. And then, as I say, it wasn't really... How realistically can a jury distinguish between these rival expert witnesses? Well, there was... When you're talking about the physics of the accident, there was no rivalry. They elected not to put one up. So... You mean an expert? Correct. Yeah, who costs a lot of money. I mean, this was a very... He said it was an interesting trial. As an appellate lawyer, I thought it was interesting, too, because they had no experts on the forces involved. They had no experts on what? On the forces. We had the person who measured the distance. They didn't do that. And we had the person who testified that, as a matter of physics, it couldn't happen this way. And he also testified... Why couldn't it happen this way? If you're not sure about whether the train stopped after its little seven- or nine-inch lurch, if you don't know whether it stopped suddenly or not, how do you know whether there was forward momentum which could have carried him over the stairs? Well, all I can tell you is that Dr. Tsoumanos was there to say the accident could not have happened the way Mr. Kellum said. That's what he was there for. And Kellum said there was a lurch, and I was somersaulting forward for this new theory to have happened. He would have had to first have been forced backwards and then sprung forward into the... Do I recall that he did not make any complaint until four days after the incident? My understanding is two. Two days? Two. And he testified exactly to how he fell and what hurt? He... Well, first of all, another interesting aspect of this is that he didn't tell anybody about the somersault, which is pretty dramatic, right? Until he was telling the NTSB, and I think that's what was four days later. So it took him four days to come up... Well, I don't want to be mean, but it took four days before he said that he somersaulted. And... All of the evidence put in by all parties, including the pictures and his testimony, were before the jury and subject to direct and cross-examination. Yes, Your Honor. Hmm. You know, I'm sort of curious about the first sentence of your summary of the argument. I think it's in the red brief. That's you, right? That's me and my colleagues, yes. Well, it says, the jury had every reason to conclude that Kellum was using the January 2012 derailment as an opportunity to get the surgical intervention for his long-standing back problems that he had been putting off for years. Where did that come from? Well, that was our theory of the case. So... Yeah, but that isn't... At least I didn't... I only saw that as the only place that he was doing this just to get... so he could get his injury paid for. Well, we're just responding to his arguments in the brief. We're not making a jury... No, all right. Well, I just... I was curious about that sentence. You know, that's just sort of appellate advocacy. Because you said the jury had every reason to think that, and they said, well, you know, he's just... and, you know, we all know that when you work for a big company, there's medical coverage and there's workers' comp and there's all kinds of other stuff that if you get injured, you have somebody who's going to pay for it. And, of course, that's... if there's a big injury verdict, they offset that. But the jury doesn't know that. At least they don't... they're not supposed to. But the jury had every reason to conclude. That's what I... I was curious about how you came up with that. Well, we had two competing theories of the case. Theirs was I was perfectly asymptomatic before this happened, and then there was this rear-end collision and I somersaulted down the steps, and two days later I started feeling this pain. And, you know, lo and behold, the doctor said, it's not the condition you had before, it's a condition that was dormant before. And so, presto, now you can have the surgery and you've got a good feeler claiming to pay for it. That's their theory. Our theory is the converse, that it didn't happen the way he said, it couldn't have happened the way he said. There was original testimony by his conductor that he was already downstairs when it happened. There were a lot of inconsistencies in both of their testimonies. Both of them sued us. Yeah, I see. He's got a suit going somewhere. He did too. We won that one also. Because of, I think they have, their theories didn't make, they didn't hold up when common sense jurors took a look at it. Well, what is your argument that he had this surgery really to correct his pre-existing spinal problem and he wasn't injured at all in the accident? Our theory is that he was not injured in the accident. We don't even know if he fell in the accident. So what was his incentive to argue that he had been injured? Well, negligence is conceded, right? It's a rear-end collision by another CSX. But he had this long-standing spinal problem. Yes. Now, had that been, was the railroad responsible for that? No. No, the railroad wasn't responsible. So your argument is he had to attribute his spinal pain to the accident in order to have his medical expenses paid for by the railroad. Is that it? That's exactly right. Well, you know, that's interesting because it feels pretty tough. You know, it's pretty accommodating for injuries on railroad, at least it used to be. I don't know whether... No, it is. In fact, you know, we lost the case in the Supreme Court five years ago on causation where we had argued... Yeah, but I'm just looking at, if somebody, let's just say nothing else happened and he was walking down the steps while he's working and he falls and hurts his back, there's not any question that his medical coverage is going to pay for that, is there? No, no. If it's all his own fault... Well, no. I don't know whose fault it is. A lot of times, you know... It's not a no-fault statute. All right. Well, it's pretty close. That's all I'm saying. Well, the standard of negligence is exactly the same as under the common law. It's causation that's been relaxed. But he would have to prove negligence. Now, in this case, that part was established. So causation was the only issue. And we argued, you know, you made this up because, as Judge Posner pointed out, he couldn't recover against us for the pre-existing. He couldn't get that surgery paid for by us. That seems to be what we assume here. Because that was... And we don't know the cause of that pre-existing condition. I think... It could have been congenital. It could have been congenital. You know, he talked about it was bothering him for a couple of months, and then he lifted his knees, and it became really bad. Well, it was bad. I mean, he had back pain. A lot of people have that. And he's working, you know. He's riding a train and bouncing along. I'm sure it's not comfortable. But he took some heavy medicine. That's all. He took heavy medicine. And, you know, that, of course, is one of their arguments in the case is that the jury shouldn't have been told about all of that. Right. And I'm sure all those things were kicked around. So are there other issues the court would like me to address? He raised a total of five to six in the brief. No, I guess not. Okay. Thank you, Your Honor. Okay, thank you. So, Mr. Garmisa, do you have anything further? Your Honor, if I may, a few quick points. I believe that the video itself shows the shudder and bounce that I was describing. You can see the shudder and bounce. You might have to look at the video several times because it's 300 milliseconds. But there is a loopback button on the top right of the playback. And it can be seen. He did complain. Judge Bauer, Your Honor, asked when he complained. It was actually, I believe, the day after he called his regular physician and she said, Dr. Lane said, go to the emergency room where he was examined by Dr. Nichols. And Dr. Nichols determined that the test for the herniated disc, which was his old problem, was negative. There was no evidence of the herniated disc. That's why they were thinking, all right, this is the spondylolisthesis that suddenly became symptomatic. He told, Mr. Kelham told the National Transportation Safety Board under oath that he was knocked down the stairs by the collision. So this was not something... And then he said the same thing in his report. When did he say that? I think it was a couple days after the accident. They called him in. They were up on it. They were examining it pretty quickly. And he gave the statement to the railroad the same day saying he was knocked down the stairs by the accident. Another couple of points. Cross-examination is not a substitute for expert testimony that doesn't satisfy the requirements of Dauber. And yes, they say in Dauber, shaky expert testimony. If you got shaky expert testimony, sometimes it qualifies under Dauber, but you get the cross-examination. Each side put on expert testimony, did they not? They put on expert testimony. Each side did. Well, we didn't have an expert on biomechanics or mechanical engineering. Why not? Because Mr. Farina didn't believe that any federal judge would have let this expert testimony in. I don't think he still... I have a question. He made a decision. Yes. Now he regrets it or no? No. He still doesn't believe that... I'm sorry. I didn't want to interrupt you. The fact of the matter is he did not bring any counter expert testimony in to support his position. No. All he did was attack the other side. Not on the... Because he didn't believe that it was... His belief or disbelief is not material to anything I can think of right now. You asked about his tactical decision. What the jury heard was what was presented by each side and it was nothing preventing you from bringing in additional witnesses. We... Well, by the time the Dauber motion was actually ruled on, I think discovery was... I can't remember the name of an expert at that point. If Mr. Farina tried the case in the Daily Center, he would have known, all right, junk science is coming in. But it was federal court. He never believed it. And Dr. Soumanis relied on Mr. Vosburgh who he had... He brought an exemplar train out to the area of the accident and then he said he located it to try to get a pretty good... He said they had a pretty good idea that it was located where Mr. Calhoun's locomotive was at the time of the accident. A pretty good idea. That's not a mechanical engineering term I ever heard of. And then he said... Wasn't that telephone pole that you could look at in the video and move a little bit? You can't see... See, that's why I thought... Originally, I thought he was going to use simple trigonometric, you know, the Pythagorean theory. There was a pole that was three feet high. It was X number of feet forward. You could have calculated these things with a great deal of specificity. He said he had at his office a software program called Photomodeler where you can take a video and pictures and you can determine distances moved. So... But he did... He said they estimated that this was how far it moved. They moved it forward. They moved it forward. Was any evidence offered by the defense or by the plaintiff that was rejected? Excuse me, Your Honor? Any expert witness or evidence offered by the plaintiff that was rejected by the court? No, sir. And I see my time is up. Yeah, well, that wouldn't make any difference as long as I'm shooting off my mouth. But the answer was no. There was no expert testimony offered by the plaintiff that was rejected. Thank you. Thank you, Your Honor. Thank you, Mr. Garmese. Thank you to both counsel. Next case...